Gerald DEARMITT and Ada
DeArmitt, Appellants

v.

NEW YORK LIFE INSURANCE
COMPANY and Russell F.
Bicker, Appellees.

Superior Court of Pennsylvania.

Argued April 26, 2011.
Filed June 28, 2013.

Kenneth R. Behrend, Pittsburgh, for appellants.

James W. Gicking, Philadelphia, for Bicker, appellee.

Stuart C. Gaul, Jr., Pittsburgh, for New York Life, appellee.

BEFORE: STEVENS, P.J., GANTMAN, and STRASSBURGER,* JJ.

OPINION BY GANTMAN, J.:

Appellants, Gerald DeArmitt and Ada DeArmitt, appeal from the summary judgment entered in the Allegheny County Court of Common Pleas in favor of Appellees, New York Life Insurance Company ("NYLIC") and Russell F. Bicker ("Mr. Bicker"). For the following reasons, we reverse and remand for further proceedings.

The relevant facts and procedural history of this case are as follows. In 1985, Appellants sold their motel and motor home park business. The buyers gave Appellants a down payment, and a mortgage that the buyers agreed to pay off over the course of twenty years, beginning in 1986. In 1988, Appellants contacted Mr. Bicker, an agent for NYLIC, about putting $50,000.00 in an annuity or annuity-like investment product. Appellants specifically told Mr. Bicker they did not want life insurance; they wanted something that would produce a steady source of retirement income to replace the income they were getting from the mortgage payments when the mortgage was paid in full.

Mr. Bicker provided Appellants with an illustration showing how an initial investment of $50,000.00 could grow to $153,000.00 after eighteen years. Mr. Bicker indicated Appellants could then withdraw $12,000.00 to $14,000.00 each year without depleting the principal. Mr. Bicker insisted an investment product like

---

* Retired Senior Judge assigned to the Superior Court.

this always had a small life insurance component. Appellants purchased the recommended product.

In 1993, Appellants noticed an approximate $1,800.00 shortfall between the projected and the actual cash values of the investment, so Mr. DeArmitt again met with Mr. Bicker. Mr. Bicker explained to Mr. DeArmitt that the investment he had purchased was performing slightly below estimates but assured him that it would eventually meet its projected cash value as promised.

In 1995, Appellants received a notice from NYLIC informing customers of an upcoming class action suit. Appellants had their NYLIC investment product independently reviewed only to discover it was not an annuity investment at all. Instead, Appellants learned for the first time that they had purchased a whole life insurance policy.

Appellants initiated this action against NYLIC and Mr. Bicker by writ of summons filed on October 26, 1995. In Appellants' third amended complaint, which they filed on May 20, 1999, they raised five counts: (I) common law fraud and deceit, (II) negligence, (III) statutory violation of the Unfair Trade Practice and Consumer Protection Law ("UTPCPL"),[1] (IV) fraud violation of the UTPCPL, (V) and negligent supervision.

In June 2008, the trial court entered partial summary judgment in favor of NYLIC and Mr. Bicker and dismissed the negligence counts (II and V) of Appellants' third amended complaint, based on the statute of limitations relevant to those negligence counts.[2] The trial court also decided Appellants could not prevail on a fraud-in-the-execution claim based on a failure of the writing to include a guarantee Appellants would receive $153,000.00 at the end of eighteen years, because Mr. DeArmitt said he knew ahead of time that dividends were not guaranteed. The court characterized Mr. DeArmitt's testimony as an "admission" that barred his claim on that basis. The court then stated:

> I reach the opposite result with respect to the claim that the writing should have included an investment vehicle different from a standard whole life policy. According to the testimony of Mr. DeArmitt, he did not want life insurance and the New York Life agent never told [the DeArmitts] that their money was being used to purchase a standard whole life policy. Instead, he described what [the DeArmitts] were purchasing as an annuity tied in with insurance. A fact finder may find that the agent's alleged description was intended to and did cause [the DeArmitts] to reasonably believe that they were not purchasing only a whole life policy under which substantial portions of the annual dividends would be used to cover life insurance.

(Order and Opinion, filed June 16, 2008, at 4). Essentially, the court preserved Appellants' fraud-in-the-execution claim based on the nature of the writing itself to the extent it was not the product sought and promised. Nevertheless, by order dated June 23, 2010 and entered June 24, 2010, the court granted final summary

---

1. Long before Appellants filed their third amended complaint in 1999, the state legislature amended the UTPCPL. The amendments to the various provisions became effective at different times between November 1996 and January 1997. Appellants' third amended complaint was filed after all the effective dates of the amendments and all relevant proceedings occurred after those dates. No one disputes which version of the UTPCPL applies; and for purposes of this particular disposition, it does not matter.

2. The dismissal of the negligence counts is not contested on appeal.

judgment against Appellants and dismissed their complaint entirely, based on the court's conclusion, as a matter of law, that Appellants could not establish at trial any actual damages or ascertainable loss.

Appellants timely filed a notice of appeal on June 25, 2010. On July 2, 2010, the trial court ordered Appellants to file a concise statement of the errors complained of on appeal pursuant to Pa.R.A.P. 1925(b); they timely filed it on July 21, 2010.

Appellants raise the following issues for review:

THE TRIAL COURT ERRED IN GRANTING PARTIAL SUMMARY JUDGMENT ... AND DISMISSING [APPELLANTS'] CLAIMS BASED UPON [APPELLEES'] ORAL MISREPRESENTATION THAT [APPELLANTS'] INVESTMENT OF A ONE-TIME PAYMENT OF $50,000.00, WOULD GENERATE A RETURN OF AT LEAST $153,000.00 IN EIGHTEEN YEARS, EVEN THOUGH [APPELLEES] HAD NO REASONABLE BASIS TO BELIEVE THIS REPRESENTATION TO BE TRUE AT THE TIME OF SALE.

THE TRIAL COURT ERRED ... IN HOLDING THAT [APPELLANTS] HAD SUFFERED NO DAMAGES AS A RESULT OF [APPELLEES'] MISREPRESENTATIONS SINCE [APPELLEES], WHO WERE ALLEGED TO HAVE COMMITTED AN INTENTIONAL FRAUD IN THE SALE OF A LIFE INSURANCE POLICY DISGUISED AS AN INVESTMENT, WERE PERMITTED BY THE COURT TO USE THE COST OF THE FRAUDULENTLY SOLD LIFE INSURANCE POLICY, AS WELL AS THE CASH VALUE OF THE POLICY, AS A SET–OFF AGAINST [APPELLANTS'] RECOVERY OF DAMAGES.

THE TRIAL COURT ERRED ... IN HOLDING THAT A TORTFEASOR WITH UNCLEAN HANDS IN THE SALE OF AN INSURANCE PRODUCT WAS ENTITLED TO CLAIM AS AN OFFSET OF DAMAGES THE ALLEGED VALUE OF THE FRAUDULENTLY SOLD PRODUCT.

THE TRIAL COURT ERRED IN GRANTING PARTIAL SUMMARY JUDGMENT ... AND FINAL SUMMARY JUDGMENT ... BY MAKING CREDIBILITY DETERMINATIONS IN VIOLATION OF THE *NANTY-GLO* [3] RULE.

(Appellants' Brief at 3).

Initially, we observe:

"Our scope of review of an order granting summary judgment is plenary." *Harber Philadelphia Center City Office Ltd. v. LPCI Ltd. Partnership,* 764 A.2d 1100, 1103 (Pa.Super.2000), *appeal denied,* 566 Pa. 664, 782 A.2d 546 (2001). "[W]e apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a genuine issue of material fact." *Id.* "We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered." *Caro v. Glah,* 867 A.2d 531, 533 (Pa.Super.2004) (citing *Pappas v. Asbel,* 564 Pa. 407, 418, 768

3. *Borough of Nanty-Glo v. American Surety Co. of New York,* 309 Pa. 236, 163 A. 523 (1932).

A.2d 1089, 1095 (2001), *cert. denied*, 536 U.S. 938, 122 S.Ct. 2618, 153 L.Ed.2d 802 (2002)).

Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of his cause of action. *Grandelli v. Methodist Hosp.*, 777 A.2d 1138, 1145 n.7 (Pa.Super.2001).... Thus, a record that supports summary judgment will either (1) show the material facts are undisputed or (2) contain insufficient evidence of facts to make out a *prima facie* cause of action or defense and, therefore, there is no issue to be submitted to the [factfinder]. *[Id.]* at 1143 (citing Pa.R.C.P. 1035.2 Note). "Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions." *[Id.]* at 1144. The appellate Court may disturb the trial court's order only upon an error of law or an abuse of discretion. *Caro, supra.*

> Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason. Similarly, the trial court abuses its discretion if it does not follow legal procedure.

*Miller v. Sacred Heart Hosp.*, 753 A.2d 829, 832 (Pa.Super.2000) (internal citations omitted). "Where the discretion exercised by the trial court is challenged on appeal, the party bringing the challenge bears a heavy burden." *Paden v. Baker Concrete Constr., Inc.*, 540 Pa. 409, [412], 658 A.2d 341, 343 (1995) (citation omitted).

> [I]t is not sufficient to persuade the appellate court that it might have reached a different conclusion if ...

charged with the duty imposed on the court below; it is necessary to go further and show an abuse of the discretionary power. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence or the record, discretion is abused. *Id.* (internal quotations and citations omitted).

*Bartlett v. Bradford Publishing, Inc.*, 885 A.2d 562, 566 (Pa.Super.2005).

*Lineberger v. Wyeth*, 894 A.2d 141, 145–46 (Pa.Super.2006). Pennsylvania Rule of Civil Procedure 1035.2 provides for summary judgment in pertinent part as follows:

**Rule 1035.2. Motion**

> After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law

> (1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

> \*　　　\*　　　\*

> *Note:* Rule 1035.2 sets forth the general principle that a motion for summary judgment is based on an evidentiary record which entitles the moving party to judgment as a matter of law. The evidentiary record may be one of two types. Under subparagraph (1), the record shows that the material facts are undisputed and, therefore, there is no issue to be submitted to a [fact-finder].

> An example of a motion under subparagraph (1) is a motion supported by a

record containing an admission. By virtue of the admission, no issue of fact could be established by further discovery or expert report.

\* \* \*

Oral testimony alone, either through testimonial affidavits or depositions, of the moving party or the moving party's witnesses, even if uncontradicted, is generally insufficient to establish the absence of a genuine issue of material fact. *See Nanty–Glo* [*supra* ]; *Penn Center House, Inc. v. Hoffman,* 520 Pa. 171, 553 A.2d 900 (1989).

\* \* \*

Pa.R.C.P. 1035.2. The question of whether there exist any genuine issues of material fact is subject to a *de novo* standard of review. *Drelles v. Manufacturers Life Ins. Co.,* 881 A.2d 822, 830–31 (Pa.Super.2005).

Appellants initially challenge the court's interpretation of Mr. DeArmitt's deposition testimony as an "admission" that he knew the dividends were not guaranteed. Specifically, Mr. Bicker showed Mr. DeArmitt an illustration to demonstrate how the investment Mr. Bicker recommended could grow and the dividends it could pay. When Mr. DeArmitt initially asked Mr. Bicker about the disclaimer, Mr. Bicker explained that another company had computed the projections table and disclaimer, returns had never gone below the promised levels, and returns were usually higher than indicated on the table. Mr. Bicker confidently assured Appellants there was a reasonable basis for the projections with respect to the product he recommended. Appellants submit Mr. DeArmitt's testimony in this regard was not as settled and unambiguous as to be deemed an "admission" that would preclude a fraud-in-the-execution claim, based on the failure of the writing to include a guarantee Appellants would receive $153,000.00 at the end of eighteen years.

Appellants assert the court viewed Mr. DeArmitt's deposition testimony in the light most favorable to NYLIC and Mr. Bicker, while failing to consider it in the context of the entire record. Appellants insist the facts taken as a whole indicate NYLIC through Mr. Bicker promised to sell Appellants the kind of financial product Appellants explicitly wanted and that the product they were buying would be worth roughly $153,000.00 after eighteen years. Appellants claim Mr. Bicker's reassurances about the performance of the product before the purchase convinced Appellants that the projections were virtually certain, notwithstanding the disclaimer. When Mr. DeArmitt came back to Mr. Bicker in 1993, to find out why the product he had sold them was not performing as anticipated, Mr. Bicker insisted the product would "meet its mark," despite any present shortfall. Fundamentally, Mr. Bicker repeated his assurance of a projected return of roughly $153,000.00.

Appellants contend the issue of whether they justifiably relied on Mr. Bicker's statements was for a fact-finder, and not for the court to decide as a matter of law. Appellants insist the unequal relationship between Appellants and Mr. Bicker, and the complicated nature of investment products weighs in favor of Appellants' justifiable reliance on Mr. Bicker's sales pitch. Given the disputed facts surrounding the purchase of the product and subsequent reassurances as to its projected value, Appellants aver the trial court erred when it decided as a matter of law that Appellants could not have justifiably relied on Mr. Bicker's statements about the future value of the product he had sold them.

Appellants additionally aver that Mr. Bicker gave them misleading sales illustrations depicting the financial vehicle's pro-

jected future value. Appellants claim those projections were confusing and deceptive because they were not based on reliable information concerning the particular product's future cash value in eighteen years. As vendors of insurance products, NYLIC and Mr. Bicker had superior knowledge and a duty to avoid relevant misrepresentations to induce Appellants to purchase the product he sold to them. Appellants maintain Mr. Bicker's misrepresentations caused Appellants to purchase a product that actually varied significantly from what they wanted to buy and what they were led to believe they were buying. Appellants analogize the sale of a financial product in this context to the sale of securities; because this product was sold as a financial investment, heightened standards and scrutiny applied to the transaction.

Appellants next advance several arguments concerning damages. Appellants initially complain that damages should be based on Appellants' reasonable expectations of the future value of the investment vehicle they wanted to buy. Appellants insist Mr. Bicker's illustration, statements, and reassurances created a reasonable expectation that the product Appellants bought would be worth approximately $153,000.00 after eighteen years. Appellants maintain the proper amount of damages should be based on that expectation.

Appellants aver the proper starting point for determining damages would be the 2009 value of an independent financial product, with a purchase date of 1988, garnering an average of six percent (6%) yearly interest, which is the kind of product Appellants intended to buy. The 2009 value of the intended product, minus the 2009 cash surrender value of the policy they bought, would yield: ($180,176.87 − $112,269.13) = $67,907.74, as the proper starting point to calculate damages. Appellants claim their numbers are realistic because the average return on a NYLIC single premium annuity from 1988 to 2009 was actually 5.29%. Any additional interest sought (up to 6%) would be appropriate in light of the purpose of the UTPCPL and the alleged fraud perpetrated on Appellants. Appellants claim the trial court improperly calculated the starting point for determining damages by looking at the actual value in 2009 of a hypothetical NYLIC annuity purchased in 1988. The court took that value and subtracted from it the 2009 cash surrender value of the insurance policy Appellants were sold to compute a starting point for damages: ($147,325.28 − $112,269.13) = $35,056.15. Then the court offset that amount by $37,937.09, which the court found was the cost of the additional life insurance coverage Mr. DeArmitt enjoyed from 1995 until 2009. Appellants assert the court erred in setting off the damages in that manner because Appellants did not want a death benefit (life insurance) in the first place, which they told Mr. Bicker. Appellants also insist they immediately challenged the death-benefit aspect of their policy in 1995, once they learned they had unintentionally purchased a whole life insurance policy. Appellants submit they could not surrender the policy without incurring financial harm and additional tax liability.

Moreover, Appellants emphasize they have already paid NYLIC for the death-benefit coverage through the automatic use of dividends and reductions in the policy face value to cover the subsequent premiums for that coverage. In other words, Appellants insist the court essentially double-counted those costs against Appellants.

Appellants further claim they obtained no value from the "death benefit" to warrant any offset because Mr. DeArmitt, the insured individual, has not died. Appellants likewise urge any offset in damages

in favor of NYLIC is wholly inappropriate at this juncture because the value of the death benefit is "extremely difficult if not impossible to determine" with certainty. (Appellants' Brief at 62). Appellants maintain NYLIC sustains no loss from the theoretical death benefit until it has to pay the benefit. In fact, NYLIC might not ever have to pay out the death benefit if Appellants withdraw the entire cash value from the policy before Appellant Mr. DeArmitt's death. Furthermore, as opposed to suffering a loss, Appellants reason NYLIC has only profited from the policy, where NYLIC continues to earn interest and fees for the entire time the policy has been in force and has made no payout to Appellants. Appellants submit the court's damages calculations basically allowed NYLIC and Mr. Bicker to profit from their misrepresentations in order to sell Appellants a life insurance policy and charge them for a death benefit they did not want.

Appellants further aver the UTPCPL authorizes a court to award up to triple damages to deter the use of deceptive practices in the conduct of any consumer trade or commerce. Appellants suggest basic damages should be calculated first, then the statutory multiplier should be applied, and only then should any offset be subtracted. Appellants insist this order of calculations upholds the legislative intent to eradicate the use of unfair business practices. Appellants submit that shaping damages in this sequence demonstrates actual damages on their behalf.

Lastly, Appellants contend the court made certain credibility decisions in violation of the *Nanty–Glo* rule when it relied solely on NYLIC's valuation of the hypothetical annuity to decide Appellants could not prove actual damages or ascertainable loss. Appellants' damages claim constituted a genuine issue of material fact for a

fact-finder to decide. For these reasons, Appellants conclude the trial court erred in deciding Appellants had suffered no ascertainable loss and finally granting summary judgment against them and dismissing their claims with prejudice. We agree with Appellants' contentions.

Resolution of this appeal implicates the following legal principles:

## PAROL EVIDENCE

 Pennsylvania law defines the parol evidence rule as:

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract ... and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.

*Yocca v. Pittsburgh Steelers Sports, Inc.,* 578 Pa. 479, 497, 854 A.2d 425, 436 (2004) (quoting *Gianni v. R. Russel & Co.,* 281 Pa. 320, 323, 126 A. 791, 792 (1924)). The parol evidence rule seeks to preserve the integrity of a written agreement by barring the contracting parties from trying to alter the meaning of their agreement through use of contemporaneous oral declarations. *Lenzi v. Hahnemann University,* 445 Pa.Super. 187, 664 A.2d 1375, 1379 (1995). "[F]or the parol evidence rule to apply, there must be a writing that represents the entire contract between the parties." *Yocca, supra.* An integration clause stating the parties intend the writing to represent their entire agreement is a "clear sign" the writing "expresses all of the parties' negotiations, conversations and

agreements made prior to its execution." *Toy v. Metropolitan Life Ins. Co.*, 593 Pa. 20, 49, 928 A.2d 186, 204 (2007).

■■■ There is an exception to the parol evidence rule which allows parol evidence "to vary a writing meant to be the parties' entire contract where a party avers that a term was omitted from the contract because of fraud, accident, or mistake." *Yocca, supra* at 498, 854 A.2d at 436–37. Regarding the exception for fraud in the execution:

> The fact that the parol evidence rule is not applied to a fraud in the execution of a contract claim ... is significant. It means that when fraud in the execution is alleged, representations made prior to contract formation are not considered superseded and disclaimed by a fully integrated written agreement, as they are when fraud in the inducement is asserted.

*Toy, supra* at 52–53, 928 A.2d at 206–207. Instead, the prior representations "are viewed as wrongfully absent from the writing" intended to represent the parties' agreement. *Id.* at 53, 928 A.2d at 207. Thus, *Toy* makes clear the parol evidence rule does not apply in the fraud-in-the-execution context, and all the facts and circumstances surrounding the parties' transaction are admissible to determine whether the falsity of the alleged misrepresentations was obvious to the complaining party or whether the complaining party justifiably relied on the misrepresentations. *Id.* at 55, 928 A.2d at 208.

■■■ Furthermore, under the rubric of deceptive insurance practices, the failure of the insured to read the policy does not necessarily disqualify the insured's justifiable reliance on the deceptions. *Id.* at 54, 928 A.2d at 208.

> Some time ago, we determined that a party who engages in intentional fraud should be made to answer to the party he defrauded, even if the latter was less than diligent in protecting himself in the conduct of his affairs. In this regard, we consulted the Restatement of Torts, determined that its approach to the element of justifiable reliance coincided with our own, and as we had done before, embraced the rules it set forth. That is, we have relied on the principle that the recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely, but that he is not justified in relying upon the truth of an allegedly fraudulent misrepresentation if he knows it to be false or if its falsity is obvious.

*Id.* at 53–54, 928 A.2d at 207 (citation omitted). Thus, as a general rule, the insured can assert fraud in the execution, although he did not read the contract to learn of the alleged omission based on the misrepresentations upon which the insured relied. *Id.* at 55, 928 A.2d at 208.

## BINDING ADMISSIONS

■■■ A judicial admission is an express waiver made in court or preparatory to trial by a party to gain an advantage, conceding for the purposes of trial the truth of the admission. *Nasim v. Shamrock Welding Supply Co.*, 387 Pa.Super. 225, 563 A.2d 1266, 1267 (1989), *appeal denied*, 525 Pa. 619, 577 A.2d 890 (1990).

> For an averment to qualify as a judicial admission, it must be a clear and unequivocal admission of fact. Judicial admissions are limited in scope to factual matters otherwise requiring evidentiary proof, and are exclusive of legal theories and conclusions of law. The fact must have been unequivocally admitted and not be merely one interpretation of the statement that is purported to be a judicial admission. An admission is not con-

clusively binding when the statement is indeterminate, inconsistent, or ambiguous. When there is uncertainty surrounding a conceded fact, it is the role of the judge or jury as fact finder to determine which facts have been adequately proved and which must be rejected.

*John B. Conomos, Inc. v. Sun Co., Inc.,* 831 A.2d 696, 712–13 (Pa.Super.2003), *appeal denied,* 577 Pa. 697, 845 A.2d 818 (2004) (internal citations omitted). Deposition testimony of a party may be used by an adverse party for any purpose. Pa. R.C.P. 4020(a)(2).

> Rule 4020 provides that all or part of a deposition ... so far as admissible under the Rules of Evidence, may be used against any party for purposes such as impeachment or as party admissions. However, "[a]t trial or hearing, any party may rebut any relevant evidence contained in a deposition whether introduced by that party or by any other party." Pa.R.C.P. 4020(d). Thus, under the Pennsylvania Rules of Civil Procedure, depositions and interrogatory answers are not binding admissions.

*Coleman v. Wyeth Pharmaceuticals, Inc.,* 6 A.3d 502, 526 (Pa.Super.2010), appeal denied, 611 Pa. 638, 24 A.3d 361 (2011). In other words, generally depositions and interrogatory responses are admissible when otherwise permitted under the rules of evidence, but subject to rebuttal, and do not ordinarily carry the weight of binding judicial admissions. In contrast, Rule 4014 permits a party to submit requests for admissions to the opposing party that certain matters be admitted or denied. Pa.R.C.P. 4014. "Matters admitted under Pa.R.C.P. 4014 are 'conclusively established' unless they are withdrawn ... with court permission." *Id.* Our Supreme Court, however, discourages summary judgment based on "deemed admissions." *Coleman, supra.*

## COMMON LAW FRAUD

■ To prove a claim for common law fraud, a party "must show: (1) a representation; (2) material to the transaction at issue; (3) made falsely, with either knowledge or reckless disregard of its falsity; (4) with the intent [of] misleading another person or inducing justifiable reliance; and (5) an injury caused by the reliance." *Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC,* 40 A.3d 145, 152 n. 5 (Pa.Super.2012) (citing *Bortz v. Noon,* 556 Pa. 489, 499–500, 729 A.2d 555, 560 (1999)).

## UTPCPL

■ The UTPCPL is Pennsylvania's consumer protection law and seeks to prevent "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce...." The purpose of the UTPCPL is to protect the public from unfair or deceptive business practices. Our Supreme Court has stated courts should liberally construe the UTPCPL in order to effect the legislative goal of consumer protection.

The UTPCPL provides a private right of action for anyone who "suffers any ascertainable loss of money or property" as a result of "an unlawful method, act or practice." Upon a finding of liability, the court has the discretion to award "up to three times the actual damages sustained" and provide any additional relief the court deems proper. Section 201–2(4) lists twenty enumerated practices which constitute actionable "unfair methods of competition" or "unfair or deceptive acts or practices." The UTPCPL also contains a catchall provision at 73 P.S. § 201–2(4)(xxi). The pre–1996 catchall provision prohibited "fraudulent conduct" that created a likelihood of confusion or misunderstanding.

In 1996, the General Assembly amended the UTPCPL and revised Section 201–2(4)(xxi) to add "deceptive conduct" as a prohibited practice. The current catch-all provision proscribes "fraudulent **or deceptive conduct** which creates a likelihood of confusion or of misunderstanding."

*Bennett, supra* at 151–52 (internal citations omitted). *See also Agliori v. Metropolitan Life Ins. Co.*, 879 A.2d 315, 318 (Pa.Super.2005) (stating purpose of UTPCPL is to protect consumer public and eradicate unfair or deceptive business practices; foundation of UTPCPL is fraud prevention, and its policy is to place consumer and seller of goods and services on more equal terms; courts should construe its provisions liberally to serve remedial goals of statute).

■ As in common law fraud, however, the UTPCPL plaintiff must still prove justifiable reliance and causation, because the legislature "never intended [the] statutory language directed against consumer fraud to do away with the traditional common law elements of reliance and causation." *Toy, supra* at 46, 928 A.2d at 202. Recently, this Court held that an insured, as a general rule, has no right to a jury trial in a pure UTPCPL action. *Fazio v. Guardian Life Ins. Co. of America*, 62 A.3d 396 (Pa.Super.2012).

## JUSTIFIABLE RELIANCE

■ In the non-commercial life insurance context, the customer is not required to scrutinize the policy to see if it matches the insurance agent's representations and meets the insured's expectations. *Drelles, supra* at 835. "This Court has held that an insurance agent's expertise in the field of life insurance vests his ... representations with authority and tends 'to induce the insured to believe that read-ing the policy would be superfluous.'" *Id.* at 836.

Moreover, "normal" contract principles do not apply to insurance transactions. Life insurance policies are contracts of adhesion and the adhesionary nature of life insurance documents is such that a non-commercial insured is under no duty to read the policy as issued and sent by the insurance company. Courts must be alert to the fact that the expectations of the buying public are in large measure created by the insurance industry itself. *Tonkovic v. State Farm [Mut. Auto. Ins. Co.]*, 513 Pa. 445, 456, 521 A.2d 920, 926 (1987).

Through the use of lengthy, complex, and cumbersomely written applications, conditional receipts, riders, and policies, to name just a few, the insurance industry forces the insurance consumer to rely upon the oral representations of the insurance agent. Such representations may or may not accurately reflect the contents of the written document and therefore the insurer is often in a position to reap the benefit of the insured's lack of understanding of the transaction.

*Id.* In particular, the life insurance industry, despite repeated cautions from the courts, has persisted in using language which is obscure to a layman and, in tolerating agency practices, calculated to lead a layman to believe he has coverage beyond that which may be called for by a literal reading of the policy. Regardless of the ambiguity, or lack thereof, inherent to a given set of insurance documents (whether they be applications, conditional receipts, riders, policies, or whatever), courts must examine the dynamics of the insurance transaction itself to ascertain the reasonable expectations of the consumer.

*Id.* at 836–37 (some internal citations and one footnote omitted). Where nothing in the record supports the notion that the purchaser is an expert concerning the financial or insurance industry or the vocabulary used in that industry, he cannot be expected to use terms of art with the same understanding as a financial or insurance expert or even a lawyer might. *Id.* at 839. Thus, justifiable reliance often involves credibility determinations which are likewise for the fact-finder to resolve. *Id.*

> In view of the trust placed in insurance agents, it is not unreasonable for consumers to rely upon the representations of the expert rather than on the contents of the insurance policy itself, or to pass when the time comes to read the policy. Ultimately, policyholders have no duty to read the policy and are entitled to rely upon agent's representations unless the circumstances of the case make it "unreasonable" for them not to read the policy.

*Id.* at 840–41. Finally, the issue of justifiable reliance in this context also requires the fact-finder to consider "the relationship of the parties involved and the nature of the transaction" to determine whether the purchasers justifiably relied upon the agent's representations to the extent necessary to support their UTPCPL claims. *Id.* at 841. For these reasons at least, justifiable reliance is typically a question of fact for a fact-finder to decide. *Toy, supra* at 55, 928 A.2d at 208.

### DAMAGES

 To recover damages under the UTPCPL, a plaintiff must demonstrate an "ascertainable loss **as a result of** the defendant's prohibited action." *Weinberg v. Sun Co., Inc.,* 565 Pa. 612, 618, 777 A.2d 442, 446 (2001) (emphasis in original).

> The determination of damages is a factual question to be decided by the fact-

finder. The fact-finder must assess the testimony, by weighing the evidence and determining its credibility, and by accepting or rejecting the estimates of the damages given by the witnesses. Although the factfinder may not render a verdict based on sheer conjecture or guesswork, it may use a measure of speculation in estimating damages. The fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable, inferential, as well as direct and positive proof.

*Penn Elec. Supply Co., Inc. v. Billows Elec. Supply Co., Inc.,* 364 Pa.Super. 544, 528 A.2d 643, 644 (1987) (internal citations omitted).

The provision governing damages in private actions under the UTPCPL, in pertinent part, states:

### § 201–9.2 Private Actions

 (a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any **ascertainable loss** of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover **actual damages** or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the **actual damages** sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.

73 P.S. § 201–9.2(a) (footnote omitted) (emphasis added). "The UTPCPL does not provide a formula for calculation of 'actual damages.'" *Agliori, supra* at 319.

Nevertheless, case law makes clear "that the UTPCPL was meant to supplement—not replace—common law remedies." *Id.* Under circumstances where the entire transaction was based on misrepresentations as to its true cost, an assessment of ascertainable loss cannot be made simply by examining what was purchased. *Id.* at 321. "Ascertainable loss must be established from the factual circumstances surrounding each case. . . ." *Id. See, e.g., Lesoon v. Metropolitan Life Ins. Co.,* 898 A.2d 620, 633 (Pa.Super.2006), *appeal denied,* 590 Pa. 678, 912 A.2d 1293 (2006) (stating plaintiff should be compensated, at minimum, for difference in value between what he bargained for and what he received). Thus, ascertainable losses can include costs and other shortfalls associated with the transaction at issue. *Id.* at 632; *Agliori, supra.*

When calculating a damages award under the UTPCPL:

> Decisions by our Supreme Court and this Court have stressed time and again the deterrence function of the statute. If the court permits the appellee-defendants simply to repay what is owed the consumer under the fraudulently induced contract, the deterrence value of the [UTPCPL] is weakened, if not lost entirely. We cannot accept such an evisceration of the statutory goals.

*Id.* at 321–22 (internal citations omitted). Although Pennsylvania has no definitive rule on the subject, several states multiply the plaintiff's gross damages under the state's respective consumer protection law before applying any **justified** setoff. *See Richardson v. Bank of America, N.A.,* 182 N.C.App. 531, 643 S.E.2d 410, 431–32 (2007) (stating plaintiff's gross damages should be multiplied first before applying setoff in order to effectuate punitive and remedial purposes of state's unfair trade practices statute); *Ameripride Linen &*

*Apparel Services, Inc. v. Eat Well Inc.,* 65 Mass.App.Ct. 63, 836 N.E.2d 1116, 1121–22 (2005) (stating same); *Davis v. Wholesale Motors, Inc.,* 86 Hawai'i 405, 949 P.2d 1026 (App.1997) (stating same). We have found one state that subtracts the justified setoff from the gross damages before applying any statutory multiplier under its consumer protection law. *See Acco Constructors, Inc. v. National Steel Products Co.,* 733 S.W.2d 368, 370 (Tex.App.–Hous.1987) (explaining allowable offsets should be applied to plaintiff's damages award before multiplying net damages, pursuant to state's Deceptive Trade Practices Act, based on preference of prior Texas Supreme Court rulings to multiply only net damages).

## RULE OF *NANTY–GLO*

The Pennsylvania rule governing the use of oral testimony to decide the outcome of a case in motions practice provides:

> However clear and indisputable may be the proof when it depends on oral testimony, it is nevertheless the province of the [fact-finder] to decide, under instructions from the court, as to the law applicable to the facts, and subject to the salutary power of the court to award a new trial if they should deem the verdict contrary to the weight of the evidence. . . . The credibility of these witnesses, without whose testimony plaintiff could not have recovered, was for the [fact-finder], and plaintiff's motion for binding instructions should not have been granted.

*Nanty–Glo, supra* at 238, 163 A. at 524 (internal citations omitted).

> Initially, it must be determined whether the plaintiff has alleged facts sufficient to establish a *prima facie* case. If so, the second step is to determine whether there is any discrepancy as to any facts material to the case. Finally, it must be

determined whether, in granting summary judgment, the trial court has usurped improperly the role of the [factfinder] by resolving any material issues of fact. It is only when the third stage is reached that *Nanty–Glo* comes into play.

*Dudley v. USX Corp.*, 414 Pa.Super. 160, 606 A.2d 916, 920 (1992), appeal denied, 532 Pa. 663, 616 A.2d 985 (1992).

The function of the summary judgment proceedings is to avoid a useless trial but is not, and cannot, be used to provide for trial by affidavits or trial by depositions. That trial by testimonial affidavit is prohibited cannot be emphasized too strongly. In considering a motion for summary judgment, the lower court must examine the whole record, including the pleadings, any depositions, any answers to interrogatories, admissions of record, if any, and any affidavits filed by the parties. From this thorough examination the lower court will determine the question of whether there is a genuine issue as to any material fact. On this critical question, the party who brought the motion has the burden of proving that no genuine issue of fact exists. All doubts as to the existence of a genuine issue of a material fact are to be resolved against the granting of summary judgment.

In determining the existence or nonexistence of a genuine issue of a material fact, courts are bound to adhere to the rule of [*Nanty–Glo*] which holds that a court may not summarily enter a judgment where the evidence depends upon oral testimony.

However clear and indisputable may be the proof when it depends on oral testimony, it is nevertheless the province of the [fact-finder] to decide, under instructions from the court, as to the law applicable to the facts, and

subject to the salutary power of the court to award a new trial if [it] should deem the verdict contrary to the weight of the evidence.

*Penn Center House, In.v. Hoffman,* 520 Pa. 171, 175–76, 553 A.2d 900, 902–03 (1989). The *Nanty–Glo* rule means "the party moving for summary judgment may not rely solely upon its own testimonial affidavits or depositions, or those of its witnesses, to establish the non-existence of genuine issues of material fact." *Dudley, supra* at 918. "Testimonial affidavits of the moving party or his witnesses, not documentary, even if uncontradicted, will not afford sufficient basis for the entry of summary judgment, since the credibility of the testimony is still a matter for the [factfinder]." *Penn Center House, supra* at 176, 553 A.2d at 903.

 If, however, the moving party supports its motion for summary judgment with admissions by the opposing party, *Nanty–Glo* does not bar entry of summary judgment. *InfoSAGE, Inc. v. Mellon Ventures, L.P.,* 896 A.2d 616, 631 (Pa.Super.2006). To carry the weight of a binding judicial admission, however, the opposing party's acknowledgment must conclusively establish a material fact and not be subject to rebuttal. *See John B. Conomos, Inc., supra* at 713 (stating: "When there is uncertainty surrounding a conceded fact, it is the role of the … fact finder to determine which facts have been adequately proved and which must be rejected").

With regard to expert opinions in the context of summary judgment, our Supreme Court said:

It has long been Pennsylvania law that, while conclusions recorded by experts may be disputed, the credibility and weight attributed to those conclusions are not proper considerations at summary judgment; rather, such determina-

tions reside in the sole province of the trier of fact........

> At the summary judgment stage, a trial court is required to take all facts of record, and all reasonable inferences therefrom, in a light most favorable to the non-moving party. This clearly includes all expert testimony and reports submitted by the non-moving party or provided during discovery; and, so long as the conclusions contained within those reports are sufficiently supported, the trial judge cannot *sua sponte* assail them in an order and opinion granting summary judgment. Contrarily, the trial judge must defer to those conclusions, ... and should those conclusions be disputed, resolution of that dispute must be left to the trier of fact.

*Glaab v. Honeywell Intern., Inc.,* 56 A.3d 693, 697–98 (Pa.Super.2012) (quoting *Summers v. Certainteed Corp.,* 606 Pa. 294, 309–10, 997 A.2d 1152, 1161 (2010) (internal citations and quotation marks omitted)).

▇ Instantly, Appellants approached Mr. Bicker in 1988, after selling their motel and motor home park business, to invest $50,000.00 in an annuity or annuity-like investment vehicle with tax benefits. Mr. Bicker provided Appellants with materials demonstrating how an investment of $50,000.00 in a New York Life product would grow to approximately $153,000.00 in eighteen years. Appellants specifically told Mr. Bicker they wanted to purchase an annuity or annuity-type product from which they could draw a stream of income after eighteen years, without depleting the principal. They specifically told Mr. Bicker they did not want life insurance. Nevertheless, Mr. Bicker informed Appellants that any annuity necessarily has a life insurance component for tax benefits. Appellants put $50,000.00 into the New York Life product that Mr. Bicker recommended.

In 1993, Appellants noticed a shortfall in the performance of the investment, and Mr. DeArmitt again met with Mr. Bicker. Mr. Bicker admitted the product he had sold Appellants was performing slightly below estimates but assured them it would meet its projected earnings in the long run. In 1995, Appellants initiated this present action when they realized the product they purchased was just a whole life insurance policy.

▇ Appellants' allegations that (a) Mr. Bicker had assured Appellants the product he sold them would be worth $153,000.00 or more after eighteen years and (b) Mr. Bicker had sold the product to Appellants as an annuity-like investment vehicle fall within the fraud in the execution exception to the parol evidence rule because Mr. Bicker led them to believe they were purchasing an annuity with a life insurance component that would generate income in eighteen years, not just a death benefit whole life insurance policy. *See Toy, supra.* Even the trial court confirmed Appellants had pled fraud in the execution, at least with respect to their claim that the product they bought should have included an investment vehicle other than just a standard whole life insurance policy. As a result, the parol evidence rule alone would not bar Appellants' submission of the prior negotiations, promises, or materials to prove they expected to buy an annuity or annuity-like vehicle that would accrue at least a value of $153,000.00 over eighteen years. Likewise, the parol evidence rule should not bar consideration of Mr. Bicker's later reassurances after execution of the contract that the product sold to Appellants would meet the promised forecast. *See id.* at 49, 928 A.2d at 204; *Yocca, supra* at 497, 854 A.2d at 436.

Nevertheless, in favor of NYLIC and Mr. Bicker, the court relied on certain deposition testimony of Mr. DeArmitt to defeat Appellants' claim regarding the value of the product sold to them. The exact exchange at the deposition was as follows:

[Opposing Counsel]: There is a paragraph at the bottom of both Exhibit No. 7 and Exhibit No. 8 which begins, "Dividends are not guaranteed." Do you remember seeing that language on these illustrations in 1988?

[Mr. DeArmitt]: Yes, I do.

[Opposing Counsel]: Did you ask any questions about that language at the time?

[Mr. DeArmitt]: Yes, I did.

[Opposing Counsel]: Did you at that time have an understanding of what a dividend was?

[Mr. DeArmitt]: I understand a dividend as being the return on the money.

[Opposing Counsel]: Did you ask Mr. Bicker any questions about what a dividend meant in the context of this illustration?

[Mr. DeArmitt]: No, I did not.

\* \* \*

[Opposing Counsel]: Did you ask Mr. Bicker any questions about the statement on both Exhibit No. 7 and Exhibit No. 8 "Dividends are not guaranteed"?

[Mr. DeArmitt]: Yes, I did.

[Opposing Counsel]: What did you ask him?

[Mr. DeArmitt]: I said, "It says here it is not guaranteed, your return isn't guaranteed." He told me this statement is made up by another company for the insurance company, and he told me that it is not guaranteed, but it has never [gone] below what it was on the illustra-

tion. On the contrary, in most cases it is well above.

\* \* \*

(N.T. Deposition of Gerald DeArmitt, 5/13/04, at 88–89; R.R. at 162a–163a). The court interpreted this testimony as a binding admission that Mr. DeArmitt understood the product he bought did not guarantee the dividends, the return, or the expected investment growth. On its face, however, Mr. DeArmitt's testimony does not represent a clear and unequivocal admission of fact, in light of Mr. DeArmitt's immediate qualification in the form of Mr. Bicker's comments, which minimized both the value and importance of the chart and note about the dividends. The uncertainty surrounding the purported "admission" naturally calls into question its weight as a binding declaration. *See John ·B. Conomos, Inc., supra* at 712–13. Moreover, the policy as executed does actually contain certain guarantees, which could also be viewed as discounting the significance of the note at the bottom of the chart. (*See* Whole Life Policy, Table of Guaranteed Values, at 2A; R.R. at 233a). In the light most favorable to Appellants as the non-moving parties, it is unclear whether Mr. DeArmitt really understood the import of the disclaimer or believed it would apply to Appellants' investment. *See John B. Conomos, Inc., supra.* Consequently, Mr. DeArmitt's testimony regarding the disclaimer was not an unequivocal admission that should automatically defeat Appellants' claim. *See Coleman, supra.* Appellants should be given the opportunity to rebut, clarify, or explain Mr. DeArmitt's perception of the disclaimer. *See id.* The trial court erred when it granted summary judgment in favor of NYLIC and Mr. Bicker on the basis of Mr. DeArmitt's supposed "admission"; it is for the factfinder to determine if Appellants can prove justifiable reliance. *See John B. Conomos,*

*Inc., supra.* See *Toy, supra* (reiterating that all facts and circumstances surrounding parties' transaction are admissible to determine if alleged misrepresentations were obvious to complaining party or complaining party justifiably relied on misrepresentations; as general rule, justifiable reliance is question of fact).

With respect to Appellants' ability to prove actual damages, the trial court overlooked several pertinent rules of law. First, the parties presented conflicting evidence through the presentation of expert evidence on the issue of ascertainable loss. The court erred when it chose between conflicting expert evidence at the summary judgment stage and relied on the moving party's expert report to decide a material issue of disputed fact regarding damages. The credibility and weight to be attributed to the experts' conclusions were not proper considerations at summary judgment. See *Nanty–Glo, supra; Glaab, supra.*

Second, the trial court offset damages by the cost of the additional life insurance the policy provided. Appellants consistently argued an offset for the cost of the life insurance was inappropriate because Appellants did not want the life insurance in the first place, no death benefit had ever been paid, and Appellants already paid for the life insurance coverage through NYLIC's automatic use of dividends earned and yearly reductions in policy value to cover those premiums. The court erred under *Glaab* and *Nanty–Glo*, when it used NYLIC's expert opinion to calculate a hypothetical starting point for damages, based on a superficial comparison of financial products which were not necessarily similar, and then offset any loss with the cost of insurance coverage Appellants had already paid for and did

not even want. In so doing, the court overcompensated NYLIC at Appellants' expense. Moreover, the UTPCPL contemplates a deterrence factor in calculating damages, which the court completely ignored when it declared the damages issue a wash and dismissed the case. See *Agliori, supra.*

Essentially, the court interpreted the record against Appellants, who were the non-moving parties in the case, and made certain fact-based and credibility assessments, which have no place at the summary judgment stage. Accordingly, we reverse and remand for further proceedings.[4]

Judgment reversed; case remanded for further proceedings. Jurisdiction is relinquished.

## CONCURRING AND DISSENTING OPINION BY STRASSBURGER, J.:

I agree with the Majority that summary judgment in this matter must be reversed and the case remanded to the trial court.

The trial judge granted summary judgment not because Plaintiffs did not present a sufficient quantum of proof of fraud or unfair trade practice but because the court found that Plaintiffs suffered no damages.

In so doing the trial judge erred in two respects. First it set off against Plaintiffs' damages the benefits they received from having life insurance coverage. The problem with this is, if they can be believed, they did not ask for nor want such coverage. They should not be charged with this benefit that they neither asked for nor wanted.

Secondly, in calculating Plaintiffs' net loss to be zero, the trial court relied on the oral testimony of a defense witness. As

4. We deny any open motions filed in this matter.

the Majority properly holds, this violates the *Nanty–Glo* rule.

Because remand is necessary, I must point out several areas that I disagree with the Majority. First, the Majority holds that Husband–Plaintiff's deposition testimony that he knew that the dividends were not guaranteed did not constitute an admission barring that portion of his claim. You can call a cat a dog, but it is still a cat, and Husband–Plaintiff's statement sure looks like an admission to me.

Once it is determined that NYLIC is not entitled to credit for the life insurance benefits that Plaintiffs neither asked for nor wanted, and that the trial court violated *Nanty–Glo,* I do not know why the Majority delves any further into damages, with liability still to be determined.

However, since the Majority does discuss these issues, I am compelled to respond. Even though Plaintiffs admitted that the average return on a NYLIC single premium annuity from 1988 to 2009 was 5.29%, the Majority says additional interest up to 6% would be "appropriate in light of the purposes of the UTPCPL and the alleged fraud perpetrated on [Plaintiffs]." Majority Opinion, at 588. The interest rate is not dependent on whether Defendants have been good citizens or bad.

Finally, the Majority presents without deciding the issue of whether if treble damages are awarded under the UTPCPL, the trebling should be applied to the gross damages or to the net damages after offsets. I am not at all sure why this issue is broached at all at this state, but if the intention is to give guidance to the trial judge, it is perfectly apparent to me that the trebling must apply to the net amount.