J-A17019-18

2018 PA Super 252

| GARY L. GREGG AND MARY E. GREGG | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| AMERIPRISE FINANCIAL, INC., AMERIPRISE FINANCIAL SERVICES, INC., RIVERSOURCE LIFE INSURANCE COMPANY AND ROBERT A. KOVALCHIK, | |
| Appellants | No. 1504 WDA 2017 |

Appeal from the Order Entered, September 20, 2017,
in the Court of Common Pleas of Allegheny County,
Civil Division at No(s): G.D 01-006611.

BEFORE: OTT, J., KUNSELMAN, J. and MUSMANNO, J.

OPINION BY KUNSELMAN, J.: FILED SEPTEMBER 12, 2018

Introduction

Ameriprise Financial, Inc.; Ameriprise Financial Services, Inc.; Riversource Life Insurance Company; and Robert A. Kovalchik ("the insurance companies") appeal a non-jury verdict finding that they deceitfully profited from a business transaction with Gary and Mary Gregg. The trial judge held the insurance companies in violation of the "catchall" provision of Pennsylvania's Uniform Trade Practices and Consumer Protection Law (UTPCPL).[1] That catchall provision prohibits anyone who advertises, sales, or distributes goods or services from "[e]ngaging in any . . . fraudulent or

———————————————————————

[1] 73 P.S. § 201-1 et seq.

deceptive conduct which creates a likelihood of confusion or of misunderstanding" during a transaction. 73 P.S. § 201-2(4)(xxi).

A decade ago, our appellate courts disagreed over that provision. The Commonwealth Court of Pennsylvania, interpreting it expansively, granted consumers greater protections under the UTPCPL than under common law, while this Court did not. After studying Commonwealth Court and federal precedents, we realized we had inadvertently reduced a 1996 amendment's impact. Thus, in Bennett v. A.T. Masterpiece Homes, 40 A.3d 145 (Pa. Super. 2012), we adopted Commonwealth Court's consumer-friendly view of the catchall provision.

In the case at bar, the insurance companies would essentially have us undo Bennett. They argue that a jury verdict in their favor on common law claims precluded a non-jury verdict against them under the UTPCPL. The Commonwealth Court rejected that argument in 2011. Hence, the insurance companies invite us to reopen the split in authority that Bennett repaired. We decline their invitation and affirm.

Factual Background

In 1999, Robert A. Kovalchik, a financial adviser and insurance salesperson, solicited the Greggs to become his new customers. The Greggs and Mr. Kovalchik knew each other, because Mr. Kovalchik had advised Mr. Gregg's mother and sold her financial products, including insurance.

At his first formal meeting with the Greggs, Mr. Kovalchik held himself out as having skill, training, and expertise in insurance and investment products. Mr. Kovalchik offered to review the Greggs' assets, liabilities, financial worth, investments, and goals. He said that he would advise and counsel them as to insurance or investment products, that they should rely upon his advice and counsel, that they could trust him to achieve their financial goals, and that they should delegate investment decisions to him.

Mr. Kovalchik also asked the Greggs a series of questions regarding their current life insurance protection, financial needs, retirement goals, and current financial situation. The Greggs revealed that they owned seven Prudential life insurance policies. Those Prudential Policies had a combined value of $121,000.

Mr. Kovalchik and the Greggs met a second time, when Mr. Kovalchik recommended various insurance and investment products to them. Based upon his review and analysis, Mr. Kovalchik advised the Greggs to liquidate their $121,000 Prudential Polices, so he could place the assets into IDS Life Insurance, a corporation that the appellant insurance companies eventually acquired.

During his sales pitch, Mr. Kovalchik told the Greggs to purchase a new $170,000 Flexible Premium Variable Life Insurance Policy for Mr. Gregg and a $75,000 spousal rider for Mrs. Gregg. Mr. Kovalchik also recommended that they surrender their existing IRAs and use those funds to purchase IRAs through IDS. Mr. Kovalchik then advised them not to enroll

Mrs. Gregg into an Air Force-provided plan that would have paid her military benefits if Mr. Gregg died, because the insurance companies would provide better coverage at lower costs.

Mr. Kovalchik presented the Greggs with a "Life Insurance Illustration" to demonstrate that, if Mr. Gregg purchased the new $170,000 Flexible Premium Variable Life Insurance Policy through IDS Life ("the IDS Policy") and made annual payments of $1,671, the Greggs could expect the IDS Policy to accrue significant cash value. As a result, he led the Greggs to believe that they could use that policy as their retirement plan.

The Greggs believed him and signed an application to purchase the IDS Policy. The Greggs also agreed to "roll-over" their existing IRAs into IRAs with IDS. Mr. Kovalchik directed them to surrender the proceeds from their Prudential Policies to fund the IDS Policy. The Greggs did so.

In December 1999, the Greggs provided Mr. Kovalchik with a $300 check, because he told them that the money would increase the savings portion of the IDS Policy. The Greggs also authorized automatic withdrawal of $300 per month from their checking account to cover the savings portion of the IDS Policy.

IDS issued them the IDS Policy.

A few weeks later, Prudential sent several checks to IDS from the now-liquidated Prudential Policies; $13,600.60 went into the IDS Policy. Unbeknownst to the Greggs, however, Mr. Kovalchik began dividing their monthly $300 contributions between the IDS Policy and the two IRAs.

Also, despite Mr. Kovalchik's original plan for all Prudential Policy funds to go into the IDS Policy, this was not possible. Thus, Prudential sent an $11,601.34 check for the remainder directly to the Greggs.

When Mr. Kovalchik learned this, he contacted the Greggs to offer them additional products. He told them he would deposit approximately $9,500 of $11,601.34 into their IDS Policy. Instead, he put $1,700 into each of their new IRAs.

In June 2000, Mr. Kovalchik opened an AXP Growth Fund account for the Greggs and deposited $6,100 of the Prudential Polices' proceeds into that account. Thus, he never invested any of the $9,500 into the IDS Policy. In addition, each IRA transactions increased Mr. Kovalchik's commissions via a surcharge of 5.75%.

Next, the Greggs began sending Mr. Kovalchik $200 per month, which they believed were going to the IDS Policy. However, Mr. Kovalchik actually put the money in the AXP Growth Account. Every AXP Growth Fund deposit increased Mr. Kovalchik's commissions, because they all carried the 5.75% surcharge.

The Greggs received a class action notice in January 2001, which led them to believe that the insurance companies broke the law. They sued. Among other things, the Greggs alleged fraudulent misrepresentation, negligent misrepresentation, and violation of the UTPCPL's catchall provision.

The common law claims of fraudulent and negligent misrepresentation went to a jury, which returned defense verdicts on both counts. Relying

upon the record from the jury trial, the judge made the following findings of fact:

> this court finds that [the insurance companies'] conduct created a likelihood of confusion or misunderstanding in their dealings with the [Greggs]. Even if the financial advisor did not directly misrepresent the cost of the life insurance policy, he failed to clearly and fully explain the cost and terms of the policy; and the [Greggs] reasonably believed they would not have to pay additional monies to fund the policy once their existing policies were transferred to the [insurance companies]. Additionally, the [Greggs] relied upon the [insurance companies] to their financial detriment when they elected to forgo the purchase of the survivor benefit option for Mr. Gregg's military pension, and instead cashed-in their whole life policies to purchase the variable life insurance policy recommended by [Mr. Kovalchik]. This court found the [Greggs]' testimony to be credible on these issues; and the [Greggs] proved all elements of their UTPCPL claim by a preponderance of the evidence.

Trial Court Memorandum Order, 12/7/14, at 2-3.

The trial judge then awarded $52,431.29 in UTPCPL damages to the Greggs. The judge arrived at that figure by refunding the premium that the Greggs had paid to the insurance companies, plus 6% interest, minus the $12,151.13 that the insurance companies had already paid the Greggs in September 2012. He also ordered the insurance companies to pay the Greggs' legal bills and costs of $69,421.26 and $12,065.88, respectively.

Both sides filed post-trial motions, which the trial court denied. Only the insurance companies have appealed.

They raise two issues. First, the insurance companies assert that the jury's verdict on the claims of common law misrepresentation required the trial court to dismiss the Greggs' UTPCPL claim. See Companies' Brief at 4. Also, they argue that the judge should have subtracted the value that the Greggs received by having the IDS Policy in effect from 1999 to 2012 (even though they never made a death-benefit claim) from the $52,431.29 he awarded them. Id.

### Res Judicata & Collateral Estoppel

In their first argument, the insurance companies invoke the doctrines of res judicata and collateral estoppel. They assert that, in order to win a UTPCPL catchall claim, consumers must prove negligent misrepresentation or fraudulent misrepresentation. Thus, when the jury found neither form of misrepresentation, it simultaneously acquitted the insurance companies on the UTPCPL count, as well. The insurance companies therefore believe that the trial judge erred when he found them in violation of the UTPCPL.

Applying the doctrines of res judicata and "collateral estoppel . . . presents a question of law. Like all questions of law, our standard of review is de novo and our scope of review is plenary." Skotnicki v. Insurance Department, 175 A.3d 239, 247 (Pa. 2017).

Res judicata, Latin meaning "that which has been judged," prohibits parties from retrying a completed case. Thus, "an existing final judgment rendered upon the merits, without fraud or collusion, by a court of

competent jurisdiction, is conclusive of causes of action and of facts or issues thereby litigated, as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction." 46 Am.Jur.2d, Judgments § 394 at 558-559. For res judicata to apply four things must be identical between the old lawsuit and the new one: "(1) identity of issues, (2) identity of causes of action, (3) identity of persons and parties to the action, and (4) identity of the quality or capacity of the parties suing or sued." Day v. Volkswagenwerk Aktiengesellschaft, 464 A.2d 1313, 1316–1317 (Pa. Super. 1983).

The doctrine of collateral estoppel is similar to res judicata, but it does not require both parties in the second lawsuit to be the same parties from the first. "[C]ollateral estoppel is valid if, (1) the issue decided in the prior adjudication was identical with the one presented in the later action, (2) there was a final judgment on the merits, (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication, and (4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action." In re Estate of R.L.L., 409 A.2d 321, 323 n. 8 (Pa. 1979). See also Gray v. Buonopane, 53 A.3d 829, 835 n. 4 (Pa. Super. 2012).

Under either doctrine, all four elements must be present. Here, the insurance companies invoke the doctrines to shield themselves from the trial judge's verdict. However, that shield provides no refuge, because the judge and jury decided distinct issues.

The insurance companies claim the issues are identical, because, they think, "[t]o establish . . . deceptive conduct under the UTPCPL's catchall provision, the [consumer] must, at a minimum, prove . . . common law negligent misrepresentation." Companies' Brief at 15. To support their theory, the insurance companies cite Kirwin v. Sussman Automotive, 149 A.3d 333 (Pa. Super. 2016). Specifically, they offer this quote: "Deceptive conduct ordinarily can only take one of two forms, either fraudulent or negligent . . . The broadening of the UTPCPL . . . makes negligent deception, e.g., negligent misrepresentations, actionable under the post-1996 catchall provision." Companies' Brief at 19 (quoting Kirwin at 336). The companies then correctly point out that, under Kirwin, the Greggs "can establish a claim of misrepresentation under the UTPCPL's catchall provision by proving either a fraudulent misrepresentation or negligent misrepresentation." Id. at 19.

But the insurance companies attempt to transform that permissive statement into a prohibitive one, by arguing that the Greggs could only establish a UTPCPL catchall violation "by proving either a fraudulent misrepresentation or negligent misrepresentation." Id. As we will explain below, we do not read the UTPCPL so narrowly.

Granted, the word "only" appears in the quote from Kirwin, which was quoting Dixon v. Northwestern Mutual, 146 A.3d 780 (Pa. Super. 2016). The full quote from Dixon is:

[d]eceptive conduct ordinarily can only take one of two forms, either fraudulent or negligent. As noted above, the pre–1996 catchall provision covered only fraudulently deceptive practices. The broadening of the UTPCPL so as to not require fraud therefore ipso facto makes negligent deception, e.g., negligent misrepresentations, actionable under the post–1996 catchall provision.

Dixon at 790.

The issue in Dixon, however, was not whether negligent or fraudulent conduct were the only deceptions that the catchall provision bans. Rather, the question in Dixon was whether "a negligent misrepresentation can form the basis of a UTPCPL claim." Id. at 789. This Court concluded that it could. Thus, the unexplained, introductory pronouncement that "[d]eceptive conduct ordinarily can only take one of two forms, either fraudulent or negligent" did not address the issue in Dixon and was, therefore, dictum. Id. at 790 (emphasis added). For the reasons below, we disagree with that dictum and decline to give it the force of law.

We turn to the UTPCPL's language and the legislative history behind its catchall provision for explanation.

Section 201-9.2 of the UTPCPL permits a consumer who purchases goods or services to sue a vendor for engaging in unlawful conduct during a business transaction.[2] "Unlawful" acts are "[u]nfair methods of competition

_____

[2] 73 P.S. § 201-9.2 provides, in relevant part:

(a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and

(Footnote Continued Next Page)

and unfair or deceptive acts or practices." 73 P.S. § 201-3. The UTPCPL initially lists 20 specific, unlawful acts; it then has a catchall provision. See 73 P.S. § 201-2(4). The catchall provision forbids vendors from "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi).

Originally, the catchall provision only banned "fraudulent conduct," and Pennsylvania courts interpreted this phrase as requiring proof of common law fraud. See Prime Meats Inc. v. Yochim, 619 A.2d 769, 773 (Pa. Super. 1993), appeal denied, 646 A.2d 1180 (Pa. 1994). The legislature disapproved of this cramped reading. Thus, in 1996, it amended the catchall provision by adding the phrase "or deceptive" to describe the prohibited "conduct," 73 P.S. § 201-2(4)(xxi), and expanded the UTPCPL's protections beyond fraudulent misrepresentation.

This Court, however, failed to respond to the General Assembly's will. Instead of expanding our reading of the catchall provision, we clung to our pre-amendment view that consumers needed to prove fraud in order to maintain a cause of action under Section 201-2(4)(xxi). See Ross v.

(Footnote Continued) ───────────────────

> thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 31 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater.

Foremost Ins. Co., 998 A.2d 648 (Pa. Super. 2010); Colaizzi v. Beck, 895 A.2d 36 (Pa. Super. 2006); Skurnowicz v. Lucci, 768 A.2d 788 (Pa. Super. 2002); and Booze v. Allstate Ins. Co., 750 A.2d 877 (Pa. Super. 2000), appeal denied, 766 A.2d 1242 (Pa. 2000). We did this "without discussing or even acknowledging the amended provisions." Bennett v. A.T. Masterpiece Homes, 40 A.3d 145, 155 (Pa. Super. 2012).

The Commonwealth Court, however, recognized the significance of the 1996 amendment.[3] Our sister court noted that we had not accounted for the amendment, reminded us that the Supreme Court of Pennsylvania wants the UTPCPL liberally construed to advance the legislative goal of consumer protection, and held that proof of fraudulent misrepresentation was not needed to win "deceptive conduct" claims. Commonwealth v. Percudani, 825 A.2d 743 (Pa. Cmwlth. 2003). Percudani therefore marked a split of authority between the Commonwealth Court, which applied a more liberal interpretation of the catchall provision, and this Court, which adhered to our pre-amendment demand for proof of fraud. That split lasted for nine years.

Then, in Bennett, supra, two families sued a construction company for shoddily building their new homes. While charging the jury, the trial judge disregarded our precedents that limited the UTPCPL catchall provision

_____

[3] Commonwealth Court has original jurisdiction over UTPCPL claims when the Attorney General of Pennsylvania brings a public enforcement action against a vendor.

to cases of fraud. Instead, he told the jury that they could find a catchall violation if the defendants had engaged in any "misleading conduct." Id. at 150. On appeal, we distinguished our post-amendment precedents on the grounds that they had overlooked the 1996 amendment. Adopting the Commonwealth Court's logic from Percudani, we rejected the notion that proof of common law fraud was needed to show a catchall violation and affirmed. Thus, in Bennett, we reconciled our UTPCPL interpretation with that of the Commonwealth Court.

Here, by asserting that a jury's negligent misrepresentation verdict is res judicata or collateral estoppel against a catchall claim in private causes of action, the insurance companies would have us cleave a new split of appellate authority in UTPCPL jurisprudence. In Commonwealth v. TAP Pharmaceutical Products, Inc., 36 A.3d 1197 (Pa. Cmwlth. 2011), reversed on other grounds, 94 A.3d 350 (Pa. 2014), the Commonwealth Court held that a defense jury verdict on negligent misrepresentation is not res judicata or collateral estoppel against a non-jury UTPCPL catchall claim.

Here, Court of Common Pleas Judge Michael F. Marmo, in his 1925(a) Opinion, correctly explained why TAP applies to this case:

> [t]he defendants in TAP argued that a trial court, when considering a UTPCPL claim for deceptive conduct, is bound by the decision of the jury on the plaintiffs' fraudulent and negligent misrepresentation claims.
>
> Similar to the jury's decision in TAP, the jury in this case answered "no" when asked whether [the insurance companies] were liable for negligent misrepresentation. The jury also answered "no" when asked whether [the

insurance companies] were liable for fraudulent misrepresentation. The jury did not answer any specific questions regarding causation, reliance, financial harm, or outrageous or deceptive conduct . . .

. . . The [insurance companies'] argument that [res judicata and] collateral estoppel precludes this Court's award on the UTPCPL claim was rejected by . . . the Commonwealth Court . . . in TAP. Thus, [the insurance companies'] assertion that the jury's verdict in its favor on . . . fraudulent and negligent misrepresentation claims bars [the Greggs] from recovering on [their] UTPCPL based upon res judicata or collateral estoppel must fail.

In regards to [the] argument that a UTPCPL claim cannot be sustained where the alleged conduct is a misrepresentation, and such misrepresentation was not at least negligent, [the insurance companies] fail to cite any authority to support this argument. Contrary to [their] assertion, the Commonwealth Court stated in TAP that the test for deceptive conduct under the UTPCPL is "essentially whether the conduct has the tendency or capacity to deceive, which is a lesser, more relaxed standard than that for fraud or negligent misrepresentation." TAP, 36 A.3d at 1253.

Trial Court Opinion, 12/5/17, at 2-4.

We agree with the learned trial judge and the Commonwealth Court's reasoning in TAP. Had the General Assembly intended to limit the catchall provision to cover only common law misrepresentation claims, it would have done so in more direct language than "deceptive conduct." 73 P.S. § 201-2(4)(xxi). In the 1996 amendment, legislators could have prescribed only "fraudulent or negligent conduct," had they so intended. Instead, they outlawed "any . . . deceptive conduct," regardless of a vendor's mental state. Id. (emphasis added).

Hence, any deceptive conduct, "which creates a likelihood of confusion or of misunderstanding," is actionable under 73 P.S. § 201-2(4)(xxi), whether committed intentionally (as in a fraudulent misrepresentation), carelessly (as in a negligent misrepresentation), or with the upmost care (as in strict liability). Whether a vendor's "conduct has the tendency or capacity to deceive . . . is a lesser, more relaxed standard than that for fraud or negligent misrepresentation." TAP, 36 A.3d at 1253. The only thing more relaxed than negligence – regarding a consumer's burden of proof – is strict liability.

The Commonwealth Court therefore went on to say that its post-amendment precedents "have the effect of eliminating the common law state of mind element (either negligence or intent to deceive) . . . ." Id. The sound reasoning of TAP has persuaded us to adopt it in this Court, and we see no basis for creating a divergent line of authority for private lawsuits.

Our holding also comports with this Court's rationale in Bumbarger v. Kaminsky, 457 A.2d 552 (Pa. Super. 1983), where we considered the Vehicle Code's implications in tort law. Bambarger involved a delivery driver who, coming down an icy hill, lost control of his truck. Despite making every effort to break, he ran a stop sign at the bottom. He collided with another car in the intersection.

The car driver sued the truck driver (and his employer) on the theory that the trucker had violated the Vehicle Code by running the stop sign. The jury returned a defense verdict, "due to the condition of the roadways." Id.

at 553. But the trial judge held the truck driver's failure "to halt at the stop sign should not be excused under any circumstances" and granted the plaintiff a new trial. Id. at 554. "The trial court, in effect, concluded that [the truck driver] was strictly liable for failing to stop at the sign at the bottom of the hill." Id.

On appeal, this Court reversed and reinstated the verdict. In doing so, we explained that a statute imposes one of two types of duty – either (1) strict liability or (2) negligence per se. This Court turned to Dean Prosser for delineation between those two categories. Prosser wrote:

> It is entirely possible that a statute may impose an absolute duty, for whose violation there is no recognized excuse . . . In such a case the defendant may become liable on the mere basis of his violation of the statute. No excuse is recognized, and neither reasonable ignorance nor all proper care will avoid liability. Such a statute falls properly under the head of strict liability, rather than any basis of negligence . . . .

Id. (quoting W.E. Prosser, TORTS, § 36 at 197 (4th Ed.1971)).

We concluded that stop signs impose a duty of negligence per se under the Vehicle Code. Therefore, the Bambarger jury could properly excuse the Vehicle Code violation due to hazardous road conditions.

A UTPCPL violation, however, is not amenable to excuses. Indeed, we can think of no instances when a vendor's deceptive act during a commercial transaction would be excused under the statute, if, as here, the consumers justifiably relied upon that conduct to their financial detriment. Unlike the fluid nature of moving traffic and changing road conditions that might, in

some cases, excuse a driver's failure to comply with a stop sign by rendering compliance physically impossible, the same is not true of a commercial transaction. The latter occurs in a designed setting entirely of the vendor's own creation via preplanned marketing schemes. Thus, vendors place themselves, by choosing where, when, and how they enter the market, in a much stronger position to comply fully with the UTPCPL before soliciting or interacting with consumers. Vendors not only elect whether to enter a market, but, because "the market" is a fictional place, they have full volitional control over their conduct when in it.

The UTPCPL is for consumer protection. It undoes the ills of sharp business dealings by vendors, who, as here, may be counseling consumers in very private, highly technical concerns. Like the Greggs, those consumers may be especially reliant upon a vendor's specialized skill, training, and experience in matters with which consumers have little or no expertise. Therefore, the legislature has placed the duty of UTPCPL compliance squarely and solely on vendors; they are not to engage in deceitful conduct and have no legally cognizable excuse, if they do.

Thus, we hold that the General Assembly, by "eliminating the common law state of mind element (either negligence or intent to deceive)," TAP, 36 A.3d at 1253, imposed strict liability on vendors who deceive consumers by creating a likelihood of confusion or misunderstanding in private, as well as public, causes of actions. Carelessness or intent, required for negligent or fraudulent misrepresentations, may be absent when perpetrating "deceptive

conduct" under 73 P.S. § 201-2(4)(xxi). Given their varying degrees of requisite intent, a UTPCPL catchall violation and the torts of negligent and fraudulent misrepresentation raise separate legal issues, as a matter of law.

As such, we conclude that the insurance companies' assertions of res judicata and collateral estoppel fail the first step of their respective tests. Common law misrepresentations and UTPCPL catchall violations present distinct legal issues. Thus, the trial judge properly made a separate finding of fact under TAP, and the insurance companies' first appellate issue lacks merit.

## Damages under the UTPCPL

In their second appellate issue, the insurance companies seek to mitigate their damages for violating the UTPCPL. They argue that the trial judge misapplied the doctrine of rescission, because his award did not place both parties in the positions they occupied prior to Mr. Kovalchik's unlawful transaction. Relying upon THE RESTATMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 54, the insurance companies argue that they provided life insurance coverage to the Greggs of $24,027.55 from 1999 until 2012 and that, under THE RESTATMENT (THIRD), the trial judge should have offset that amount from what he awarded to the Greggs. See Companies' Brief at 34.

The interpretation of a statute – such as the UTPCPL's damages provisions – presents a legal question, for which "our scope of review is plenary, and our standard of review is de novo." Commonwealth v.

Andrews, 173 A.3d 1219, 1221 (Pa. Super. 2017). That said, in a non-jury trial, the judge's findings of fact "must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law." Wyatt Inc. v. Citizens Bank of Pennsylvania, 976 A.2d 557, 564 (Pa. Super. 2009).

The monetary awards for UTPCPL violations are "actual damages or one hundred dollars ($100), whichever is greater." 73 P.S. § 201-9.2. Moreover, the trial "court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees." Id.

The statutory language of the UTPCPL governs this UTPCPL claim. Thus, the insurance companies' reliance upon THE RESTATMENT (THIRD) OF RESTITUTION – i.e., a treatise on common law – is obviously misplaced. The trial judge properly grounded his award in the statutory remedies that our General Assembly enacted within the UTPCPL.

As the Greggs rightly stated in their appellate brief, those statutory remedies "are in addition to common law remedies." Greggs' Brief at 53. In Richards v. Ameriprise Financial, Inc., 152 A.3d 1027 (Pa. Super. 2016), this Court already made clear that:

> [t]he UTPCPL is Pennsylvania's consumer protection law. It seeks to prevent "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." 73 P.S. § 201-3. Its aim is to protect the public from unfair or deceptive business practices. Our Supreme Court has stated courts should liberally construe the UTPCPL in order to effect the legislative goal of consumer protection.

Id. at 1035 (citations omitted).

To ensure those ends, the legislature has empowered trial judges with broad remedial authority under Section 201-9.2 to undo the harm that vendors cause when they break the UTPCPL. That includes power to award treble damages to punish wayward vendors. See 73 P.S. § 201-9.2. In exercising his broad remedial authority here, the trial judge concluded that the insurance companies' "argument regarding a set off for providing insurance coverage to the [Greggs] from 1999 through 2012 . . . fails." Trial Court Opinion, 12/5/17, at 5.

The trial judge found that the Greggs paid for coverage and that the insurance companies "sustained no loss from providing the insurance because [they] did not have to pay the death benefit." Id. Thus, the insurance companies' assertion that they provided the Greggs with $24,027.55 worth of coverage goes against the facts as the trial judge found them and is irrelevant to this Court. Because the trial judge did not believe the insurance companies' factual assertion, there is no competent dollar amount of record to offset against the Greggs' monetary award.

Thus, Judge Marmo astutely concluded that the "only way" to place the parties in the same position they occupied prior to the transaction "is for the [insurance companies] to return all premium payments to the [Greggs]." Id. We agree. See DeArmitt v. New York Life Insurance Co., 73 A.3d 578, 588-589 (Pa. Super. 2013) (authorizing a full refund of deceitfully obtained life insurance premiums, when vendor paid out no death benefits). Hence, we find the trial judge correctly applied DeArmitt, and the insurance companies' second issue is likewise meritless.

Judgment affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/12/2018