J-A28019-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| DENNIS WARONSKY | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AMERIPRISE FINANCIAL, INC., | : | No. 412 WDA 2020 |
| AMERIPRISE FINANCIAL SERVICES, | : | |
| INC., RIVERSOURCE LIFE | : | |
| INSURANCE COMPANY AND | : | |
| KENNETH J. ROCK | : | |

Appeal from the Judgment Entered March 17, 2020
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  G.D. 01-007921

BEFORE:  OLSON, J., MURRAY, J., and McCAFFERY, J.

MEMORANDUM BY MURRAY, J.:                          FILED DECEMBER 11, 2020

Dennis Waronsky (Appellant) appeals from the judgment entered in favor of Ameriprise Financial, Inc., Ameriprise Financial Services, Inc., Riversource Life Insurance Company, and Kenneth J. Rock (Rock) (collectively, "Defendants").  The parties' dispute concerns two "universal" life (UL) insurance policies that Defendants sold to Appellant in 1988 and 1994.  After careful review, we affirm.

By means of background, UL insurance policies differ from standard whole life insurance policies.  The major distinctions are that UL policies have an investment savings component and flexible premiums.  These policies are comprised of the savings component and cost of insurance (COI).  In sum,

collected premium payments in excess of the COI accumulate within the cash/savings component. UL policyholders earn interest on the accumulated sums in the savings component, at a variable interest rate dependent on current market conditions.[1] Importantly, however, UL policies also contain a specified "guaranteed" interest rate (guaranteed rate), which provides a floor on how low the interest rate can go.[2] It is advantageous for UL policyholders to receive the highest guaranteed rate, as the rate increases the amount of cash that accumulates in the savings component of the policy.

Here, Appellant initially purchased a "Flexible Premium Adjustable" UL policy from Rock, an insurance agent employed by Defendants, in 1988 (1988 policy). This policy provided for a life insurance benefit of $100,000 (as well as other benefits to Appellant's wife not relevant to this appeal). Appellant paid a monthly premium of $100 for the policy. The guaranteed rate was 4.5%. Before the parties executed the policy documents, Rock showed Appellant a written illustration (1988 illustration), which contained hand-written explanatory notes by Rock. This was Rock's standard practice, which he did to inform Appellant of the details of the 1988 policy. Rock also

_____

[1] The Pennsylvania Insurance Department (PID) must approve UL policies, and their interest rates, before the policies may be sold.

[2] Depending on current market conditions, the actual interest rate earned on a UL policy can be higher than the guaranteed rate. Over the years in which Appellant maintained his UL policies, he often earned interest above the guaranteed rate.

presented Appellant with an individually tailored "Disclosure Statement" (1988 Disclosure Statement), which essentially detailed the same information as the 1988 illustration.

For the next several years, Appellant maintained the 1988 policy under the terms discussed above. In November 1993, Defendants sent an internal communication to all of their insurance sales agents located in Pennsylvania, including Rock.[3] This communication stated that the PID had authorized Defendants to reduce the guaranteed rate on all new sales of UL policies to 4%. The interest reduction applied to UL policies purchased after January 1, 1994 (the "1994 interest reduction").

On December 8, 1993 (1993 meeting), Appellant met with Rock to discuss a new UL insurance policy that Defendants had offered to Appellant to replace the 1988 policy. The new proposed policy would increase Appellant's death benefit from $100,000 to $150,000. During the 1993 meeting, Rock again showed Appellant a new written illustration, with hand-written notes, to inform Appellant of the details of the new proposed policy. This illustration stated that the guaranteed rate on the proposed policy at that time was 5%. Although no agreement was reached at the 1993 meeting, Rock and Appellant agreed to meet again to discuss the matter further.

------

[3] Both Rock and an employee of Ameriprise conceded that this communication would have been sent to Rock.

On February 2, 1994, Appellant and Rock met again (1994 meeting), and executed the new UL policy (1994 policy), which increased Appellant's death benefit from $100,000 to $150,000, with the same monthly premium of $100. The accumulated cash in the 1988 policy savings account "rolled over" into the 1994 policy. This contract, like the 1988 policy, consisted of a written policy application and a Disclosure Statement (1994 Disclosure Statement).

The 1994 Disclosure Statement contained a blank section, which required Defendants to specify both the guaranteed rate and "Guaranteed Period of Coverage." Rock did not personally enter this information on the form; rather, his administrative assistant (Rock's assistant), did so by hand. The 1994 Disclosure Statement provided that the guaranteed rate was 5%, which was inconsistent with the 1994 interest reduction. In actuality, because Appellant had applied for the 1994 policy after January 1, 1994, he received a guaranteed rate of 4%, not 5%, pursuant to the 1994 interest reduction, since he applied for the 1994 policy after January 1, 1994. Further, Rock's assistant specified in the 1994 Disclosure Statement that the guaranteed period of Appellant's coverage was to age 95. Notably, however, the 1988 Disclosure Statement stated that the guaranteed period of Appellant's coverage was to age 75. After Appellant initiated this action, Defendants alleged that the above inconsistencies were not fraudulently made; rather, they were mere clerical errors by Rock's assistant.

After Defendants approved the executed 1994 policy, Rock sent Appellant a copy of the policy documents, including the 1994 Disclosure Statement. Appellant eventually received the documents in the mail, and filed them for safekeeping.[4] Aside from this mailing, Rock did not separately advise Appellant that the guaranteed rate of 4% he received under the 1994 policy differed from the guaranteed rate of 5% that Defendants represented Appellant would receive: (a) at the 1993 meeting; and (b) in the 1994 Disclosure Statement.

In 2004, Appellant surrendered the 1994 policy. At that time, Appellant had paid Defendants approximately $19,600 in premiums toward the 1988 and 1994 policies. When Appellant surrendered the 1994 policy, Defendants sent him a check for approximately $13,000, representing the cash value accumulated in the savings account component of the policy.

Appellant initiated this action on April 20, 2001 by writ of summons. Appellant filed a complaint several years later, in September 2008. Appellant alleged 3 causes of action: fraudulent misrepresentation (FM), negligent misrepresentation (NM), and violation of the Unfair Trade Practices and

---

[4] Appellant testified that he did not thoroughly read the 1994 policy documents because he trusted Rock to fill them out correctly and consistent with his representations at the 1993 meeting. We note that a purchaser of non-commercial life insurance is not required to scrutinize policy documents to ensure that they match an insurance agent's representations about the policy. See Boehm v. Riversource Life Ins. Co., 117 A.3d 308, 324 (Pa. Super. 2015).

Consumer Protection Law (UTPCPL), 73 P.S. § 201-1, et seq.[5] These claims pertained to the representations Defendants made as to: (a) the guaranteed rate of the 1994 policy Rock verbalized and illustrated at the 1993 meeting; and (b) the guaranteed period of insurance coverage set forth in the 1994 Disclosure Statement (i.e., age 95). We will collectively refer to these misrepresentations as the "1994 policy misrepresentations."

Appellant's claims of FM and NM were tried before a jury; simultaneously, his UTPCPL claim was tried before the trial court, acting as fact-finder. Trial commenced on April 30, 2019. On May 7, 2019, the jury found for Appellant on the NM claim, and found against Appellant on the FM claim. The jury awarded Appellant damages on the NM claim of approximately $2,700. On October 21, 2019, the trial court found for Defendants on the UTPCPL claim.

In the interim, on May 13, 2019, the trial court ordered the parties to file proposed findings of fact and conclusions of law within 45 days (the "proposed findings order"). Both parties timely complied.

On October 31, 2019, Appellant timely filed post-trial motions, which included a motion for a new trial, as well as a motion for judgment notwithstanding the verdict (JNOV) regarding the FM claim and the damages portion of the NM claim. Appellant also challenged the trial court's verdict

---

[5] Appellant pled two additional causes of action, which were later dismissed by agreement.

against him on the UTPCPL claim and moved for a new trial.  Defendants filed a response in opposition.  The trial court denied Appellant's motions on March 12, 2020.  Five days later, the prothonotary entered judgment on the respective verdicts.

Appellant filed a timely notice of appeal on March 18, 2020.  The trial court did not order Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and no statement was filed.  On June 23, 2020, the trial court issued a 3-page opinion.

Appellant presents six issues for our review:

1. Did the trial court err in finding there was no violation of the Unfair Trade Practices and Consumer Protection Law?

2. Was the trial court's nonjury verdict in favor of Defendant[s] on [Appellant's] UTPCPL claim against the weight of the evidence?

3. Was the jury's determination in favor of Defendant[s] on [Appellant's] fraudulent misrepresentation claim against the weight of the evidence?

4. Did the trial court err in finding that [Appellant] failed to prove that Defendants' misrepresentations regarding the terms of the universal life policy were made either intentionally or with reckless disregard to their falsity?

5. Did the trial court err in denying [Appellant's] motion for a directed verdict and JNOV as to [Appellant's] fraudulent misrepresentation and negligent misrepresentation claims?

6. Did the trial court err by: (1) permitting Defendants to introduce evidence that they were entitled to an offset from [Appellant's] claimed damages; and (2) instructing the jury that they may deduct from [Appellant's] claimed damages an offset amount based upon the alleged "value" of the insurance coverage?

Appellant's Brief at 6 (issues renumbered, some capitalization omitted).[6]

Appellant first argues that the trial court's verdict on his UTPCPL claim was against the weight of the evidence and must be overturned. See Appellant's Brief at 61-71. After care review, we disagree.

The UTPCPL is Pennsylvania's consumer protection law; it provides a private right of action for anyone who "suffers any ascertainable loss of money or property" attributable to an unlawful method, act or practice. 73 P.S. § 201-9.2(a); see also Richards v. Ameriprise Fin., Inc., 152 A.3d 1027, 1035 (Pa. Super. 2016). It was created to prevent "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." 73 P.S. § 201-3; see also Pekular v. Eich, 513 A.2d 427, 433 (Pa. Super. 1986). We have cautioned that the

> UTPCPL must be liberally construed to effect the law's purpose of protecting consumers from unfair or deceptive business practices. In addition, the remedies of the UTPCPL are not exclusive, but are

---

[6] Appellant's brief fails to comply with Rule of Appellate Procedure 2119, which requires that:

> The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part - in distinctive type or in type distinctively displayed - the particular point treated therein, followed by such discussion and citation to authorities as are deemed pertinent.

Pa.R.A.P. 2119(a). The section headings of Appellant's argument in no way correspond to the 6 issues he sets forth in his statement of questions presented. However, we decline to find waiver and address Appellant's issues as best we discern them.

in addition to other causes of action and remedies. The UTPCPL's "underlying foundation is fraud prevention."

Boehm, 117 A.3d at 321 (citations and quotation marks omitted).

Section 201-2(4) of the UTPCPL lists 20 enumerated practices that constitute actionable "unfair methods of competition" or "unfair or deceptive acts or practices." 73 P.S. § 201-2(4)(i)-(xx). Notably, the UTPCPL also contains a "catchall" provision at section 201-2(4)(xxi). The pre-1996 amendment catchall provision, which applies to the transactions in the instant case, prohibited "fraudulent conduct" that created a likelihood of confusion or misunderstanding. Id. § 201-2(4)(xvii).[7]

We have explained:

[To] bring a private cause of action under the pre-amended version of the catchall provision of the UTPCPL, a plaintiff must establish common law fraud by a preponderance of the evidence. . . . The elements of common law fraud include: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it;[8] (5) justifiable reliance on the

_____

[7] Conversely, the post-amendment catchall provision prohibits "engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi) (emphasis added). Thus, the 1996 amendment, which is not applicable here, permits plaintiffs to proceed without satisfying all of the elements of common law fraud. See Krishnan v. Cutler Grp., Inc., 171 A.3d 856, 893 (Pa. Super. 2017); Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC, 40 A.3d 145, 152 (Pa. Super. 2012).

[8] We note that recklessness and intentional conduct are not synonymous. See Archibald v. Kemble, 971 A.2d 513, 517 (Pa. Super. 2009) ("Reckless misconduct differs from intentional wrongdoing in a very important particular.

misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

Richards, 152 A.3d at 1035 (emphasis and footnote added, citation and breaks omitted); see also Delahanty v. First Pa. Bank, N.A., 464 A.2d 1243, 1252 (Pa. 1983) ("It is well settled that fraud is proved when it is shown that the false representation was made knowingly, or in conscious ignorance of the truth, or recklessly without caring whether it be true or false.").

Appellant argues the UTPCPL verdict is against the weight of the evidence. We have stated that a new trial, based on weight of the evidence issues,

> will not be granted unless the verdict is so contrary to the evidence as to shock one's sense of justice; a mere conflict in testimony will not suffice as grounds for a new trial. Upon review, the test is not whether this Court would have reached the same result on the evidence presented, but, rather, after due consideration of the evidence found credible by the [fact-finder], and viewing the evidence in the light most favorable to the verdict winner, whether the court could reasonably have reached its conclusion. . . .
>
> We stress that if there is any support in the record for the trial court's decision to deny the appellant's motion for a new trial based on weight of the evidence, then we must affirm. An appellant is not entitled to a new trial where the evidence presented was conflicting and the fact-finder could have decided in favor of either party.

_____

While an act to be reckless must be intended by the actor, the actor does not intend to cause the harm which results from it." (citation omitted)); see also Office of Disciplinary Counsel v. Anonymous Atty. A, 714 A.2d 402, 407 (Pa. 1998) ("recklessness may be described as the deliberate closing of one's eyes to facts that one had a duty to see, or stating as fact things of which one was ignorant.").

Winschel v. Jain, 925 A.2d 782, 788 (Pa. Super. 2007) (internal citations omitted). "It is the province of the [fact-finder] to assess the worth of all testimony presented. The [fact-finder] is free to believe all, some, or none of the witness testimony presented at trial." Mader v. Duquesne Light Co., 199 A.3d 1258, 1264 (Pa. Super. 2018) (citation omitted). Further, "[o]ne of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." Phillips v. Lock, 86 A.3d 906, 919 (Pa. Super. 2014) (citation omitted).

Here, Appellant makes a compelling argument:

> In finding that the [1994 policy] misrepresentations made by Defendants only amounted to a "mistake," the trial court committed reversible error since the greater weight of the evidence supported a finding that, as a result of his training and licensing, Rock made misrepresentations with reckless indifference to the truth, in selling the [1994] policy. The evidence [also] established that [Appellant] justifiably relied upon those misrepresentations in purchasing the [1994] policy from Defendants, and that [Appellant] suffered financial harm as a result thereof.

Appellant's Brief at 62 (some capitalization omitted); see also id. at 42 (pointing out that at the time of the 1993 meeting, Rock, a licensed Pennsylvania insurance agent, had been selling UL policies on behalf of Defendants for 10 years).

Appellant further asserts that even if Defendants' 1994 policy misrepresentations were not intentional or reckless, Appellant nevertheless proved common law fraud, since innocent misrepresentations are actionable

in Pennsylvania.  See id. at 63-65 (citing Delahanty, 464 A.2d at 1252 ( "a misrepresentation innocently made is also actionable if it relates to a matter material to the transaction involved")).  Appellant adds that Rock had several opportunities to correct the 1994 misrepresentations, or contact Appellant after execution of the inaccurate 1994 Disclosure Statement, but never did so.   See Appellant's Brief at 64.   Appellant further emphasizes Rock's concession at trial that he "should have looked closer at the [1994] disclosure statement[.]"  Id. at 65 (quoting N.T., 4/30/19-5/7/19, at 651).

In Pennsylvania, a misrepresentation may be actionable under three theories:  intentional misrepresentation, negligent misrepresentation, and innocent misrepresentation.  See Bortz v. Noon, 729 A.2d 556, 560, 564-65 (Pa. 1999).  Where, as here, a plaintiff seeks monetary damages for an alleged misrepresentation, but does not seek to rescind the contract, there is "no basis for such damages under a claim of innocent misrepresentation in Pennsylvania."  Growall v. Maietta, 931 A.2d 667, 674 (Pa. Super. 2007) (emphasis added) (citing Bortz, 729 A.2d at 564-65 ("claim for a misrepresentation, innocently made, to the extent recognized in this Commonwealth, is an equitable doctrine based upon contract principles supporting equitable recision to make a contract voidable by the innocent party,"; however, it does not provide a basis to award monetary damages for tort recovery)).

Appellant is correct that innocent misrepresentations are actionable. However, Defendants' alleged innocent misrepresentations do not satisfy the intent element of common law fraud. Therefore, Defendants' innocent misrepresentations do not support Appellant's pre-amendment UTPCPL claim.

The trial court found that Defendants lacked the requisite intent to mislead Appellant, stating:

> Having heard all of the evidence, the court was not persuaded, by a preponderance of the evidence that Defendants made misrepresentations with knowledge or reckless disregard of their falsity or that Defendants acted with any fraudulent intent. Any inaccurate representations by Defendants were the result of, at most, negligence. For example, [] Rock's assistant mistakenly indicated [Appellant's] coverage would continue until age 95, when she filled out the [D]isclosure [S]tatement for the 1994 policy. The mistake was not fraudulent. Also, while five percent was the policy's guaranteed interest rate presented by [Rock] to [Appellant] as of [the] 1993 [meeting], the guaranteed rate had dropped to four percent by the time [Appellant] bought the [1994] policy [at the] 1994 [meeting], but [Rock and] Rock's assistant mistakenly, not purposely, failed to update the interest rate so as to advise [Appellant]. Because [Appellant] did not prove Defendants knowingly or recklessly made a false representation and did not prove Defendants had fraudulent intent, [Appellant's] claim under the UTPCPL failed. Richards, 152 A.3d at 1035; Boehm, 117 A.3d at 321-23. . . .

Trial Court Opinion, 6/23/20, at 2-3 (emphasis added).

Our review of the record discloses no basis to disturb the trial court's determinations, and as stated above, we may not assume the role of fact-finder or reweigh the credibility of the witnesses and the evidence adduced at trial. See Shepherd v. Pittsburgh Glass Works, LLC, 25 A.3d 1233, 1245 (Pa. Super. 2011) (stating "assessments of credibility and conflicts in evidence

are for the trial court to resolve; this Court is not permitted to reexamine the weight and credibility determinations or substitute our judgment for that of the factfinder." (citation omitted)).

Appellant contends that the trial court as fact-finder improperly overlooked the alleged special duty Defendants owed to Appellant in selling him the 1994 policy, and the duty was sufficient to prove the intent element of common law fraud:

> Insurers and licensed insurance agents have a duty to accurately disclose the material terms and conditions of the policy. The failure to inform [Appellant] of the negative changes to these material terms[, i.e., as originally set forth in the 1988 policy,] was more than a "mistake"; it was reckless, because Defendants had an affirmative duty to provide accurate information at the time of sale. Defendants also had a duty to inform [Appellant], both when the [1994] policy was issued and delivered, that the material terms and conditions were altered from what had been described at the time of sale.

Appellant's Reply Brief at 4 (citations to record omitted).

Appellant relies upon this Court's decisions in Toy v. Metro. Life Ins. Co., 863 A.2d 1, 13 (Pa. Super. 2004) (holding it was for a jury to determine whether the plaintiff's failure to conduct a cursory examination of information contained in the life insurance policy prevented plaintiff from demonstrating her justifiable reliance on the insurance agent's oral representations, and stating that the agent "possessed a duty to inform [plaintiff] that he sold her something different from what he purported to sell her."), and Pressley v. Travelers Prop. Cas. Co., 817 A.2d 1131, 1140-41 (Pa. Super. 2003) (holding that the insured had no obligation to read her automobile policy to

discover her insurance agent's misrepresentation as to the extent of the coverage, where the insured asked for particular coverage and the agent informed the insured that the policy would provide it, but the agent never amended the terms of the policy as requested). Both of these decisions are inapposite, however, as the element of common law fraud at issue was whether the respective insureds justifiably relied on their respective agents' representations, not the intent of the insurers.[9]

Assuming, arguendo, that Rock had (a) a special duty to provide Appellant accurate information concerning the 1994 policy; and/or (b) acted recklessly as argued by Appellant, Appellant must still prove that Rock intentionally misled Appellant into relying on Rock's representations. See Richards, supra. Here, the record is sufficient to support the trial court's conclusion that Appellant failed to carry his burden.

Finally, Appellant claims the trial court "erred by failing to consider whether [Appellant] proved Defendants violated three other subsections [of the UTPCPL: 73 P.S. § 201-2](4)(v), (vii), and (xiv)," none of which "require

_____

[9] Further, neither decision concerned the catchall provision of the UTPCPL.

proof of intent."[10]  Appellant's Brief at 68.  However, Appellant never raised this claim before the trial court; therefore, it is waived.  See Trigg v. Children's Hosp. of Pittsburgh, 229 A.3d 260, 269 (Pa. Super. 2020) (citing Pa.R.A.P. 302(a) and stating "it is axiomatic that issues not raised in lower courts are waived for purposes of appellate review, and they cannot be raised for the first time on appeal.").  Indeed, the trial court's order expressly cautioned the parties that any claims not raised in proposed findings would be waived, and in Appellant's proposed findings of fact and conclusions of law, the only provision of the UTPCPL Appellant asserted Defendants had violated

_____

[10] Among the enumerated practices that constitute actionable "unfair methods of competition" or "unfair or deceptive acts or practices," under section 201-2(4) are

> (v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he [or she] does not have;
>
> * * *
>
> (vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;
>
> * * *
>
> (xiv) Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made[.]

73 P.S. § 201-2(4)(v), (vii), and (xiv).

was the catchall provision. See Proposed Findings of Fact and Conclusions of Law, 9/6/19, at ¶ 108.[11] Furthermore, the cases Appellant relies upon, including Boehm and Richards, supra, concern the catchall provision, not subsections 201-2(4)(v), (vii), or (xiv).

In sum, while Appellant's weight challenge to the trial court's UTPCPL verdict is compelling, the law regarding the pre-amendment UTPCPL catchall provision does not provide a basis for relief.

Appellant next argues that the trial court erred in failing to grant his motions for a new trial/JNOV on his FM claim. See Appellant's Brief at 36-61. In reviewing a trial court's denial of a post-trial motion seeking a new trial,

> this Court applies a deferential standard of review. The decision whether to grant or deny a new trial is one that lies within the discretion of the trial court. We will not overturn such a decision unless the trial court grossly abused its discretion or committed an error of law that controlled the outcome of the case.

Woullard v. Sanner Concrete & Supply, 2020 PA Super 263, **18-19 (Pa. Super. 2020) (citation omitted). "In examining the evidence in the light most favorable to the verdict winner, to reverse the trial court, we must conclude

_____

[11] Although Appellant briefly pointed out that he asserted other violations of section 201-2(4) in his complaint, see Proposed Findings of Fact and Conclusions of Law, 9/6/19, at ¶ 90, the only argument he properly developed concerned the catchall provision. See Karn v. Quick & Reilly, Inc., 912 A.2d 329, 336 (Pa. Super. 2006) ("arguments which are not appropriately developed are waived"); Pa.R.A.P. 302. Moreover, the trial court's opinion did not address any other subsections of section 201-2(4) aside from the catchall provision.

that the verdict would change if another trial were granted." Talmadge v.

Ervin, 236 A.3d 1154, 1156 (Pa. Super. 2020) (citation omitted).

As to a trial court's denial of a motion for JNOV, our standard of review

is as follows:

> There are two bases on which the court can grant judgment n.o.v.: One, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.
>
> In an appeal from the trial court's decision to deny judgment n.o.v., we must consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner. Our standard of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical. We will reverse a trial court's grant or denial of a judgment notwithstanding the verdict only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.

A.Y. v. Janssen Pharm. Inc., 224 A.3d 1, 11-12 (Pa. Super. 2019)

(citations, brackets and paragraph breaks omitted). This Court has cautioned

that a motion for JNOV

> may not be employed to invade the province of the jury. Thus, when there is a question of fact to be resolved, it is within the sole purview of the jury. JNOV should not be entered where evidence is conflicting upon a material fact. Thus, where the jury has been presented with conflicting evidence, a motion for JNOV should be denied.

Koller Concrete, Inc. v. Tube City IMS, LLC, 115 A.3d 312, 321 (Pa. Super. 2015).

To prove a claim for common law fraud, a plaintiff must prove the 6 elements set forth in Richards, supra; but see also Richards, 152 A.3d at 1038 (stating that a plaintiff alleging common law fraud "must meet the more exacting standard of clear and convincing evidence, which is a higher standard of persuasion than mere preponderance of the evidence." (citation omitted)).

Appellant concedes that to prove the tort of FM, he must prove Defendants possessed the intent to mislead him. See Appellant's Brief at 36, 56-57. However, as discussed above, it was within the sole province of the jury, as the fact-finder on the FM claim, to evaluate the evidence and credibility of the witness as to the intent element; we may not invade the province of the jury. See Shepherd, supra. Accordingly, the trial court did not err in denying Appellant's motions for JNOV/new trial, and this claim lacks merit.

Finally, Appellant argues that the trial court, as fact-finder on the UTPCPL claim, and the jury, as fact-finder on the FM claim, "failed to follow the law as set forth in [a certain] jury instruction." Appellant's Reply Brief at 1. Appellant contends that contrary to the instruction, the fact-finders, in deciding damages, were not permitted to consider whether (a) Appellant received any value for the UL insurance provided by Defendants from 1988 to 2004; and (b) said value (if any) may be deducted from the damages award

against Defendants. See Appellant's Brief at 72-80. Appellant further claims that the trial court erred in permitting Defendants to introduce evidence regarding the alleged "value" of the 16 years of life insurance coverage Defendants provided Appellant. Id. at 77.

The law is well-settled:

> Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and we will not reverse the court's decision absent a clear abuse of discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

Parr v. Ford Motor Co., 109 A.3d 682, 690 (Pa. Super. 2014) (en banc) (citations and quotation marks omitted). Moreover, an award of damages, including whether to provide for an offset, is within the sound discretion of the jury. See A.Y., 224 A.3d at 30.

Here, the trial court instructed:

> If you find that [Appellant] received a benefit from his purchase of insurance between 1998 and 2004, you may consider the value of this benefit and you may deduct from his damages the value to him of such benefit. The law does not permit a person to benefit from a fraudulent act. If you find the financial harm to [Appellant] was caused through deception and fraud, then you must award an amount sufficient to compensate [Appellant] for the value of the use of [Appellant's] money by [D]efendants. [D]efendants are not permitted to earn any profit from [Appellant's] money that was unlawfully held.

N.T., 4/30/19-5/7/19, at 1609 (emphasis added).

The trial court subsequently opined:

[Appellant] claims the court erred in allowing the jury to consider evidence in support of Defendants' argument for a setoff. [Appellant] wanted life insurance coverage and he received coverage. Defendants provided and administered that coverage for him. Defendants were entitled to seek a setoff. [Appellant] relies on distinguishable cases such as DeArmitt v. New York Life, 73 A.3d 578 (Pa. Super. 2013), Gregg v. Ameriprise, 195 A.3d 930 (Pa. Super. 2018), and Agliori v. Metro. Life, 879 A.2d 315 (Pa. Super. 2005). In DeArmitt, a summary judgment case, the trial court allowed a setoff against the plaintiffs' damages but doing so was error because the plaintiffs did not want life insurance coverage and did not think they had purchased life insurance coverage. They thought they had purchased an annuity. See DeArmitt, 73 A.3d at 584, 598. A setoff was inappropriate. Id. In Gregg, setoff was disallowed because the trial court found the defendants simply did not provide a credible, competent dollar amount for the offset. Gregg, 195 A.3d at 941. The Agliori opinion involved the parties' dispute about what the amount of the death benefit, which was paid, should have been. The Agliori case did not turn on the setoff issue raised in this case. Agliori, 879 A.2d at 319-21. [Appellant] in this case has not demonstrated that this court erred.

Trial Court Opinion, 6/23/20, at 2-3.

There is no basis to disturb the trial court's reasoning. Our review discloses no error by the trial court in admitting evidence, nor was the jury precluded from considering it. Appellant argued that he did not receive any value for the years of life insurance he received. See N.T., 4/30/19-5/7/19, at 1609. The jury was free to accept or reject this argument. See A.Y., supra; see also Mader, supra. Thus, we find no merit to Appellant's claims in this regard.

In sum, and consistent with the foregoing legal authority, we conclude that Appellant's issues do not merit relief.

Judgment affirmed.

- 21 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/11/2020